# In the Iowa Supreme Court

No. 24–1254

Submitted December 16, 2025—Filed March 27, 2026

**State of Iowa**,

Appellee,

vs.

**Andrew Jay Porter,**

Appellant.

Appeal from the Iowa District Court for Polk County, Scott J. Beattie, judge.

Discretionary review from the denial of the defendant's motion to suppress evidence obtained allegedly in violation of his constitutional right to be free from unreasonable searches. **Affirmed.**

McDonald, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Mansfield, and May, JJ., joined. McDermott, J., filed a dissenting opinion, in which Oxley, J., joined.

David V. Newkirk (argued) of Branstad & Olson Law Office, Des Moines, for appellant.

Brenna Bird, Attorney General, and Nicholas E. Seifert (argued), Assistant Attorney General, for appellee.

**McDonald, Justice.**

Andrew Porter was in the right place but at the wrong time. He arrived at his longtime friend's house early one morning at the same time peace officers were surveilling the house as a suspected drug house. The peace officers observed Porter arrive, and they watched him enter the house carrying a backpack. Shortly after Porter arrived, the officers breached the house and executed a premises warrant to search for evidence of controlled substances. As part of the search of the house, the officers searched the backpack Porter had carried into the home. They found methamphetamine and marijuana inside the backpack. Porter was arrested and charged with several drug offenses. He moved to suppress evidence of the drugs found in the backpack. The district court denied the motion, and we granted Porter's application for discretionary review. The question presented in this case is whether the federal or state constitutional right to be free from unreasonable searches prohibits peace officers executing a search warrant from searching a backpack on the premises capable of containing evidence identified in the search warrant. On our de novo review, *see State v. Amble,* 22 N.W.3d 265, 270 (Iowa 2025), we conclude the answer is no.

I.

During the months of September and October 2023, the Mid-Iowa Narcotics Enforcement Task Force developed probable cause to believe that methamphetamine and other controlled substances were being dealt out of a house at 3601 Woodland Avenue in Des Moines. The house was owned by Four Seasons Apartments LLC, but it was rented or occupied by George Civitate. On three separate occasions in October 2023, peace officers used a confidential informant to conduct controlled buys inside the house at 3601 Woodland

Avenue. On each occasion, the informant entered the house, purchased methamphetamine in the living room of the house, and then left the house.

Based on the task force's surveillance of the house, Officer Brad Frick applied for a search warrant to search the premises for evidence relevant to the use and distribution of controlled substances. The application stated, "Based on the above-described investigation, . . . it is this affiant's belief that items of evidence listed and sought by this warrant and which are relevant to the use and/or distribution of controlled substances will be found at the following locations . . . 3601 Woodland Ave., Des Moines . . . ." The application provided a thorough physical and legal description of 3601 Woodland Avenue, including a map of the relevant area and a picture of the house. The application further stated that Officer Frick knew, based on his training and experience, that the activity observed at the house was "consistent with the ongoing use and/or distribution of illegal drugs, specifically, methamphetamine, utilizing 3601 Woodland Ave,[] Des Moines." In addition to searching the premises, the application sought additional authority to search Civitate's person and any vehicles on the premises owned by or connected to Civitate.

A neutral and detached magistrate issued a premises search warrant for 3601 Woodland Avenue. The magistrate found "probable cause to believe that the Items Sought are located in the places indicated and that the information provided justifie[d] the issu[ance] of a search warrant." The search warrant commanded law enforcement officials to "make an immediate search of such property" and take any evidence into custody. The warrant also commanded the officers "to make immediate search of the described place, persons, and vehicles for the specified property" and to "seize the specified property if found."

The task force planned to execute the warrant on the morning of November 2. Officer Frick led the search warrant team. He arrived at 3601 Woodland Avenue early that morning to conduct surveillance. At approximately 7:55 a.m., Officer Frick observed Porter arrive at the house in a red car. Officer Frick observed Porter exit the vehicle, carrying a gray duffel bag, a blue backpack, and a blanket. Porter also had a dog with him. Porter entered the residence through the back door.

The assembled law enforcement officers executed the search warrant approximately forty minutes after Porter entered the house. They knocked on the door and announced their presence. Receiving no response, they breached the door and entered the house. They found Civitate and Porter in the living room. The backpack Porter had carried into the house was positioned in the corner of the living room, outside of Porter's immediate proximity and reach. After the officers placed Porter in handcuffs, they sat him on the couch. Another individual, Jennifer Spieker, was located upstairs. The officers detained Civitate, Porter, and Spieker in the living room, provided them copies of the search warrant, and advised them of their *Miranda* rights. By this time, the peace officers had learned that Porter was on parole for controlled substances offenses and had an outstanding parole warrant. They were thus going to arrest him regardless of what the premises search revealed.

At approximately 9 a.m., officers took Porter outside to question him in a police van parked in front of the house. When an officer asked Porter why he had come to the house that morning, Porter explained that he had come to play drums with his longtime friend Civitate. When asked what he had "come here with," Porter mentioned only a gray duffel bag with "dog stuff" in it. An officer asked about the backpack. Porter responded, "I don't know about that." When

an officer stated that he saw Porter enter the house with the backpack, Porter denied ownership. After a couple of minutes, Porter asked to end the interview. The officers respected his request, and they escorted Porter back into the house and sat him on a couch in the living room, handcuffed.

While Porter was seated on the couch, the task force continued to search the house. One officer approached the blue backpack and asked, "Whose bag is this?" The officer asked Porter directly if it was his backpack, and Porter shook his head from side-to-side, indicating "no." An officer continued, "Does it have your inhaler in it?" Porter said, "No." The officer asked, "Just drugs?" "I don't know none of that," Porter responded. The officer then searched a jacket draped over the backpack and found a cellphone in the pocket. Porter acknowledged the cellphone was his. The officer then searched the backpack. He found approximately seventy-eight grams of methamphetamine packaged in seven separate baggies, marijuana, and drug paraphernalia. In addition to the drugs found in the backpack, the task force found additional methamphetamine in the living room where the officers first observed Porter as they entered the house.

Porter was arrested and charged with conspiracy to deliver a controlled substance, methamphetamine, enhanced, in violation of Iowa Code section 124.401(1)(*b*)(7) (2023); possession of a controlled substance, methamphetamine, with intent to deliver, enhanced, in violation of Iowa Code section 124.401(1)(*b*)(7); failure to possess a drug tax stamp, in violation of Iowa Code sections 453B.3 and 453B.12; and possession of a controlled substance, marijuana, enhanced, in violation of Iowa Code section 124.401(5).

Porter filed a motion to suppress evidence obtained from the search of his backpack. He claimed that the search of the backpack violated his constitutional right to be free from unreasonable searches as protected by the Fourth

Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. After reviewing the bodycam footage and hearing testimony from two of the officers involved in executing the warrant, the district court denied Porter's motion to suppress evidence. We granted discretionary review to assess Porter's federal and state constitutional claims.

## II.

The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The United States Supreme Court holds that the Fourth Amendment applies to the states and state actors via the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 655 (1961); *see also State v. Pickett*, 573 N.W.2d 245, 247 (Iowa 1997).

On its face, the Fourth Amendment does not require government officials to obtain warrants prior to conducting a search for evidence of criminal wrongdoing. "What it explicitly states regarding warrants is by way of limitation upon their issuance rather than requirement of their use." *California v. Acevedo*, 500 U.S. 565, 581 (1991) (Scalia, J., concurring in the judgment). Nonetheless, the Supreme Court holds that government officials looking for evidence of criminal activity must obtain a warrant prior to conducting a search. *Carpenter v. United States*, 585 U.S. 296, 316 (2018). The Supreme Court further holds that warrantless searches for evidence of crime are unreasonable within the meaning of the Fourth Amendment and thus unconstitutional unless the search falls within an exception to its warrant requirement. *Id.* at 316–17;

*Flippo v. West Virginia*, 528 U.S. 11, 13–14 (1999) (per curiam) ("A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement . . . ." (citation omitted)). The word "search" is a term of art within the Supreme Court's Fourth Amendment jurisprudence. Whether a search has occurred is a threshold test the Court uses to determine whether government officials needed to obtain a warrant prior to obtaining the evidence of criminal wrongdoing. *See Carpenter*, 585 U.S. at 304. As relevant here, a constitutional search occurs only when government officials intrude into an area or an effect where a person has a reasonable expectation of privacy. *See id; Minnesota v. Carter*, 525 U.S. 83, 91–92 (1998) (Scalia, J., concurring) (explaining that the expectation-of-privacy-test is a "threshold question whether a search or seizure covered by the Fourth Amendment *has occurred*").

The parties' arguments in this case center on the threshold question of whether the peace officers searched the backpack within the meaning of the Fourth Amendment. The State contends that there was no search here and no warrant was required. It argues that Porter had no reasonable expectation of privacy in the backpack because he abandoned it when he denied owning it or having any knowledge of it. *See State v. Bumpus*, 459 N.W.2d 619, 625 (Iowa 1990). Porter maintains there was a constitutional search here and that a warrant was required. Porter insists that he had a reasonable expectation of privacy in the backpack because he did not abandon it for Fourth Amendment purposes despite denying ownership or knowledge of it. Porter argues that to the extent he abandoned the backpack he was effectively compelled to do so because of the coercive circumstances involved in the search of the house.

By focusing on whether a Fourth Amendment "search" occurred and whether a warrant was required, the parties have made a category error. The abandonment doctrine addresses whether a person retains a reasonable expectation of privacy in property the person has disclaimed, but that doctrine matters only when the government conducts a warrantless search and must justify its actions through an exception to the warrant requirement. Here, the officers were not acting without a warrant; they were executing one. The relevant question is not whether Porter retained a privacy interest in the backpack requiring the issuance of a warrant, but whether the backpack fell within the scope of the warrant the magistrate had already issued. The parties have thus mistakenly treated this case as a warrantless-search case when it is a scope-of-the-warrant case.

Arizona recently dealt with the same category error problem in *State v. Garcia-Loera,* No. 2 CA–CR–2018–0220, 2019 WL 3491230, at *2–4 (Ariz. Ct. App. July 31, 2019). In that case, the defendant was charged with various drug offenses after police officers found heroin and drug paraphernalia in the defendant's purse while executing a premises search warrant of a mobile home where she was a guest. *Id.* at *1. The defendant moved to suppress the evidence. *Id.* at *2. She argued that the search of her purse was a warrantless search. *Id.* at *3. The court rejected that framing of the legal issue and concluded the proper legal issue was whether "the search of the purse was proper because it was within the scope of the premises warrant." *Id.* The court concluded that the search of the purse was within the scope of the premises warrant because the purse was a container not in the defendant's physical possession capable of containing evidence identified in the warrant. *Id.* at 4 ("Under the premises search warrant, officers could search all containers in the mobile home in which

the items sought—including marijuana, money, and weapons—could be found. Because there was no evidence establishing that [the defendant's] purse was in her possession when the SWAT team entered the mobile home, officers could search the purse pursuant to the warrant." (citation omitted)).

As in *Garcia-Loera*, we do not focus on whether the peace officers needed to obtain a search warrant since they already had one; instead, we focus on the relevant question of whether the search of the backpack was within the scope of the premises warrant.[1] On this issue, it is Porter's burden to prove the officers exceeded the scope of the warrant. *See State v. Farber*, 314 N.W.2d 365, 367 (Iowa 1982) (en banc) (noting the burden of proof is on the defendant challenging the execution of the search warrant); *State v. Garrett*, 183 N.W.2d 652, 656 (Iowa 1971) (holding the defendant carries the burden of proof to show the search warrant was invalidly issued or evidence was illegally obtained with the warrant). This rule follows from the presumption of regularity that arises out of the fact that a neutral and detached magistrate has already determined that probable cause existed to search for evidence of criminal wrongdoing. *State v. Walker*, 258 P.3d 1228, 1236 (Or. 2011) (en banc).

Porter has failed to carry his burden of establishing the peace officers' search of the backpack fell outside the scope of the premises warrant. The issuing magistrate found there was probable cause to search the premises at 3601 Woodland Avenue, and the magistrate commanded the officers to "make an immediate search of such property" to obtain evidence of controlled

---

[1]As this court unanimously explained last term, the court has an independent duty to correctly state the law despite the parties' arguments and concessions. *See Christensen v. Iowa Dist. Ct.*, 21 N.W.3d 529, 532 (Iowa 2025) ("[F]or courts to proclaim a governing legal precedent based on an adverse party's concession on a point of law creates a significant risk of establishing a bad law, and all the more so when the concession is inferred solely based on the adverse party's failure to argue the point." (alteration in original) (quoting *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 438 (2d Cir. 2024))).

substances and controlled substances distribution. Pursuant to the instructions in the premises warrant and the Code, the law enforcement officials executing the warrant were legally required to search anything on the premises at the time of execution that could contain evidence and "[t]o prevent the disposal or concealment of any property subject to seizure described in the warrant." Iowa Code § 808.7(2).

The search of the backpack pursuant to the premises warrant and the Code did not violate the Fourth Amendment. The magistrate issued the premises warrant based "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized" as the Fourth Amendment requires. U.S. Const. amend. IV. "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820–21 (1982). A premises warrant "that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for marihuana would also authorize the opening of packages found inside." *Id.* at 821. When law enforcement officers execute a premises warrant, "nice distinctions between closets, drawers, and containers, in the case of a home . . . must give way to the interest in the prompt and efficient completion of the task at hand." *Id.* The Supreme Court has made clear that this "rule applies equally to all containers." *Id.* at 821–22. The rationale for the rule "is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Wyoming v.*

*Houghton*, 526 U.S. 295, 302 (1999) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)).

The Supreme Court has created an exception to the broad scope of a premises warrant: government officials executing a premises warrant are not allowed to search the persons of mere visitors who happen to be present at the time the warrant is executed. The leading case is *Ybarra v. Illinois*, 444 U.S. 85 (1979). In that case, the police obtained a warrant to search a tavern and its bartender based on probable cause that the bartender was engaged in the sale of heroin on the premises. *Id.* at 88. When the officers arrived at the establishment to execute the warrant, they patted down and frisked the customers present at the tavern, including Ybarra. *Id.* After conducting two pat-downs and frisks of Ybarra, the officers found a cigarette pack on his person that contained six tinfoil packets of heroin. *Id.* at 88–89. The Supreme Court held that the search was unconstitutional. *Id.* at 96. "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91. When executing a premises warrant, "a search . . . of a person must be supported by probable cause particularized with respect to that person." *Id.*

Although *Ybarra* addressed only the search of a person's body, its rationale extends to items in the person's physical possession. By physical possession, we mean that the person is holding, wearing, or carrying the item. When a person holds, wears, or carries an item, a search of that item is functionally a search of the person. The intrusion is comparable because the officer must approach the person, interact with the person's body or immediate space, and examine something the person controls. For this reason, items in the physical possession of a person are extensions of the person for purposes of the *Ybarra* exception.

*See State v. Scullark*, 23 N.W.3d 49, 57 (Iowa 2025) ("We conclude that because the fanny pack was attached to his person at the time of the arrest, this is a search of the person . . . ."); *see also Curd v. City Ct.*, 141 F.3d 839, 843 (8th Cir. 1998) (concluding that personal items like bags, purses, and wallets are "immediately associated" with the person); *United States v. Graham*, 638 F.2d 1111, 1114 (7th Cir. 1981) ("Containers such as [clothing pockets, purses, or shoulder bags], while appended to the body, are so closely associated with the person that they are identified with and included within the concept of one's person."); *State v. Andrews*, 549 N.W.2d 210, 215 (Wis. 1996) ("This proscription against search of the person of an individual whose search is not specifically authorized in the warrant has been expanded to bar searches of items worn by or otherwise 'in the immediate possession of' a person because those items are considered extensions of the person.").

This limited exception is not applicable here. When the task force entered the house, the backpack was in the corner of the living room, several feet from where Porter was positioned on the floor. Porter never held, wore, or carried the backpack during the execution of the warrant. Indeed, he repeatedly disclaimed any connection to it. Under these circumstances, the backpack was no different from any other container on the premises, and the peace officers were authorized to search it pursuant to the premises warrant.

We decline to extend the *Ybarra* exception to personal effects or other items on the premises that may belong to a person not identified in the search warrant but not in the physical possession of that person. First, there is a qualitative difference between the search of a person and an unattended effect. A search of the person requires physical contact with or, at a minimum, close physical intrusion upon the human body. Such searches can be degrading in ways that

opening a container simply is not. Because "searches of a person involve a higher degree of intrusiveness, [they] require justification in addition to that provided by the probable cause that supports a premises warrant." *State v. Gilstrap*, 332 P.3d 43, 46 (Ariz. 2014). But this rationale does not extend to personal effects not in the physical possession of a person. The search of such an item, while still a search, is qualitatively less intrusive and does not require the particularized probable cause that *Ybarra* demands. As we explained in *State v. Scullark,* searches of a "person are treated differently from a search" of other areas or items. 23 N.W.3d at 55.

Second, the physical-possession rule follows from the probable cause determination made in support of issuing a premises warrant. The constitutional text requires that a warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A premises warrant satisfies this requirement by identifying a specific location and the evidence expected to be found at that location. The magistrate's probable cause finding is directed to the place and not any particular person or persons who may be present when the warrant is executed. The magistrate need not know, and typically will not know, who will be on the premises or what containers will be present. What matters is that there is probable cause to believe the specified evidence may be found at the specified location. A premises warrant issued to find evidence of controlled substances in a house thus "permits the police to search everywhere in the house, because 'everywhere' is where the contraband may be hidden." *United States v. Bishop*, 910 F.3d 335, 336–37 (7th Cir. 2018). This necessarily includes containers on the premises capable of concealing the objects of the search, regardless of who owns them. A backpack in the corner of the room not in the physical possession of any person is simply another

container on the premises legally undifferentiated for Fourth Amendment purposes from closets, drawers, or any other repository within the scope of the warrant. *See Ross*, 456 U.S. at 821.

Third, the conclusion that the scope of the warrant includes any personal effects not in the physical possession of a person not identified in the warrant is supported by Iowa caselaw. Iowa appellate decisions have repeatedly held that the Fourth Amendment does not require peace officers executing a premises warrant to obtain separate warrants for each separate thing on site that could contain evidence of criminal wrongdoing as identified in the warrant. *See, e.g.*, *State v. Stockman*, No. 20–1360, 2022 WL 109183, at *6–7 (Iowa Ct. App. Jan. 12, 2022) (holding that "officers were authorized to search [the defendant's] purse found in the master bedroom where she was located when the search commenced" because "[s]uch search was lawful under the Fourth Amendment"); *State v. Barbosa-Quinones*, No. 08–1830, 2009 WL 4111127, at *7 (Iowa Ct. App. Nov. 25, 2009) ("[T]he defendant's purse was an item that could be searched, as it was in the residence to be searched where the defendant lived and could have reasonably concealed items of the kind portrayed in the warrant."); *State v. Fisher*, No. 99–1098, 2000 WL 1724552, at *4 (Iowa Ct. App. Nov. 20, 2000) ("[U]nder the warrant, police could search all places small enough to conceal matches. . . . Because of the small items detailed in the warrant, the officers could legitimately conduct a thorough search of [the defendant's] room and all of its contents."); *Munz v. State*, 382 N.W.2d 693, 699 (Iowa Ct. App. 1985) ("[E]ven if the warrant-executing officers did in fact search jars and canisters of foodstuffs, as [the defendant] alleges, these were legitimate locations to be searched given the size of the objects [(photographs)] to be seized.").

Finally, our conclusion is supported by persuasive authorities from other jurisdictions that have considered the same issue. The Arizona Supreme Court's decision in *State v. Gilstrap* is particularly instructive. 332 P.3d 43. There, police executing a premises warrant searched a visitor's purse that was not in her physical possession. *Id.* at 44. The court held the search was within the scope of the warrant. *Id.* at 47. The court explained that the physical-possession test "aligns with the Supreme Court's decisions in *Ybarra* and *Wyoming v. Houghton*" because "*Ybarra* limits the principle that a premises warrant authorizes police to search any item that might contain the object of the search by holding that the warrant does not authorize the search of a person it does not name." *Id.* at 46. The court further observed that the physical-possession test is simple, precise, and offers better guidance to law enforcement than alternative approaches. *Id.*

Other state courts agree. *See Commonwealth v. Reese*, 549 A.2d 909, 911 (Pa. 1988) ("[T]he police are not prohibited from searching a visitor's personal property (not on the person) located on premises in which a search warrant is being executed when that property is part of the general content of the premises and is a plausible repository for the object of the search."); *State v. Merritt*, 567 S.W.3d 778, 783 (Tex. Ct. App. 2018) (adopting physical-possession test); *Andrews*, 549 N.W.2d at 218 ("[P]olice can search all items found on the premises that are plausible repositories for objects named in the search warrant, except those worn by or in the physical possession of persons whose search is not authorized by the warrant, irrespective of the person's status in relation to the premises.").

Federal circuit courts have reached the same conclusion. *See United States v. Gonzalez*, 940 F.2d 1413, 1420 (11th Cir. 1991) (holding that a

premises warrant authorized the search of a visitor's briefcase because the briefcase "could easily contain" items sought in warrant); *United States v. Johnson*, 475 F.2d 977, 979 (D.C. Cir. 1973) (holding that a visitor's purse on a coffee table was within the scope of the premises warrant because the purse "was not being 'worn' by appellee and thus did not constitute an extension of her person"); *United States v. Teller*, 397 F.2d 494, 497–98 (7th Cir. 1968) (holding that a purse placed on a bed was "merely another household item subject to the lawful execution of the search warrant" once the owner set it down and left the room).

For the reasons set forth above, we hold that during the execution of a premises search warrant, the search of an item capable of containing the objects of the search and not in the physical possession of a person is within the scope of the warrant and that such search is not prohibited by the Fourth Amendment.

### III.

Having resolved Porter's federal constitutional claim, we next address his state constitutional claim. Article I, section 8 provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized." Iowa Const. art. I, § 8. The text of article I, section 8 is materially indistinguishable from the Fourth Amendment to the Federal Constitution. That fact "does not compel us to follow the construction placed on the language by the United States Supreme Court." *State v. Mumford*, 14 N.W.3d 346, 349 (Iowa 2024) (quoting *State ex rel. Kuble v. Bisignano*, 28 N.W.2d 504, 508 (Iowa 1947)).

Porter relies on *State v. Brown*, 905 N.W.2d 846 (Iowa 2018), in support of his argument that the search of the backpack was in violation of the state constitution. In *Brown*, the defendant was visiting a residence that was subject to a narcotics search warrant. *Id.* at 847. The defendant was not named in the warrant, but she was present at the house when the officers arrived to execute it. *Id.* The officers found the defendant and others in a room having recently smoked methamphetamine and detained them. *Id.* at 847, 850. The defendant's purse was located directly in front of her when she was detained. *Id.* at 849. The officers searched the purse and found the defendant's identification and some marijuana. *Id.* at 847, 850. Brown never denied it was her purse. *Id.* This court acknowledged that "the general rule is that a valid search warrant authorizing a search includes the right to search a container found on the premises." *Id.* at 848. Nonetheless, this court held that the search of her purse violated article I, section 8, based on a theory of constructive possession. *Id.* at 855. ("In order to avoid unconstitutional[ity], any test based on possession must, at a minimum, also include within its scope property that is not in the actual possession of the unnamed person but is constructively possessed by the person.").

The *Brown* majority committed a category error by framing that case as a warrantless-search case. *Id.* at 854. Like this case, *Brown* was not a warrantless-search case. Instead, it was a case involving the scope of a search warrant. *See id.* at 847. Indeed, the three-justice dissent concluded that Brown did not meet her burden of proof to show that the purse was outside the scope of the premises search warrant. *Id.* at 858 & n.6 (Waterman, J., dissenting, joined by Mansfield and Zager, JJ.). The *Brown* majority's error was predicated on a fundamental misunderstanding of search warrants. The search warrant issued in that case was a premises warrant. *See id.* at 847 (majority opinion). Under that type of

warrant, the scope of a lawful search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (quoting *Ross*, 456 U.S. at 824). Even though the constitution protects "the owner of every container that conceals its contents from plain view," *Ross*, 456 U.S. at 822–23, "[a] container that may conceal the object of a search authorized by a warrant may be opened immediately; the individual's interest in privacy must give way to the magistrate's official determination of probable cause" with respect to the place to be searched, *id.* at 823. But the *Brown* court ignored this black letter law and instead treated the probable cause determination as extending only to the specific person identified in the warrant. 905 N.W.2d at 853 ("[A] search of the possessions of a third party at a residence is unconstitutional when the warrant does not support probable cause to search that particular person . . . ."); *id.* at 854 (discussing the "problematic nature of basing a search of Brown's purse on a warrant that did not establish probable cause to search her belongings").[2]

Setting aside the category error, *Brown* does not entitle Porter to any relief on his state constitutional claim as this case is distinguishable from *Brown* in two respects. The first is the location of the backpack in relation to Porter. *Brown* appears to be a case where the defendant was in actual possession of the purse at the time the police entered the residence to execute the warrant. Brown argued that a photograph from the scene showed the purse right beside her, which made it an extension of her person. *Id.* at 849. The state conceded that a photograph showed Brown handcuffed and on her knees with the purse on the floor directly

---

[2]The dissent makes the same error as the *Brown* court regarding search warrant law, wholly ignoring the Supreme Court's opinions regarding the basis for obtaining and the scope of items to be seized pursuant to a search warrant as articulated in *United States v. Ross*, 456 U.S. at 820, *Wyoming v. Houghton*, 526 U.S. at 302, and *Maryland v. Garrison*, 480 U.S. at 84, none of which are discussed or cited in the dissent.

in front of her knees. *Id.* at 850. And the *Brown* court concluded that the search of Brown's purse was a prohibited search of her person. *Id.* at 852–54. In contrast, Porter was not in physical possession of the backpack when the police entered the house to execute the warrant or at any other time while the police were executing the warrant. Indeed, the backpack was not even in his immediate proximity. The bodycam footage shows the backpack was in the corner of the living room far outside of Porter's reach. Under these circumstances, the search of the backpack could not be considered a prohibited search of his person or the search of something in his constructive possession.

Second, even if we were to treat this as a warrantless search case involving a threshold test relating to Porter's expectation of privacy in the backpack, as in *Brown,* the State correctly argues that Porter abandoned the backpack for the purposes of the Fourth Amendment and article I, section 8 when he repeatedly disclaimed any knowledge of or possessory interest in the backpack. *See United States v. Williams,* 669 F. Supp. 3d 8, 21 (D.D.C. 2023) ("As [the officer] approached the backpack but before he searched it, he asked [the defendant], 'Is this your backpack right here?' [The defendant] replied, 'Nah.' . . . By denying to [the officer] that the backpack was his, [the defendant] disclaimed the backpack and forfeited his expectation of privacy in it." (citations omitted)); *State v. Huffman,* 820 P.2d 329, 331 (Ariz. Ct. App. 1991) ("A denial of ownership, when questioned, constitutes abandonment."); *State v. Nabarro,* 525 P.2d 573, 576 (Haw. 1974) ("Personal belongings brought by their owner on a visit to a friend's house retain their constitutional protection until their owner meaningfully abdicates control or responsibility."); *People v. Hejka,* 303 N.E.2d 433, 439 (Ill. App. Ct. 1973) ("[W]hen [the defendant] relinquished the bag he also relinquished whatever standing he might otherwise have had to challenge

the legality of a subsequent search of the envelope."); *King v. State*, 987 So. 2d 490, 493 (Miss. Ct. App. 2008) ("When [the defendant] denied ownership of the box, he relinquished the ability to object to its search and seizure."); *Commonwealth v. Wall*, No. 974 EDA 2014, 2016 WL 1082773, at *2 (Pa. Super. Ct. Mar. 18, 2016) ("[W]hen [the defendant] chose not to assert his ownership of the bag when questioned directly, he thereby failed to demonstrate an attempt to preserve the bag and its contents as private . . . [and] voluntarily relinquished his interest in the bag . . . ." (citation omitted)); *State v. Fournier*, 448 A.2d 1230, 1233 (R.I. 1982) ("In the present case, the jacket had been abandoned because defendant had disclaimed ownership of it. Under such circumstances, defendant has no standing to challenge the search."); *Marshall v. State*, No. 05–11–01591–CR, 2013 WL 1281891, at *8 (Tex. Ct. App. Mar. 22, 2013) ("Because appellant disclaimed any ownership, if there was no police misconduct to force him to deny the suitcase, then there was no unlawful search."); *Robinson v. Commonwealth*, No. 0521–97–1, 1998 WL 49076, at *2 (Va. Ct. App. Feb. 10, 1998) ("When questioned regarding the bag, he disclaimed ownership. When [the officer] stated that because no one owned the bag, she was going to examine its contents, [the defendant] did not object. [He] thus manifested a lack of expectation of privacy in the bag and abandoned it for Fourth Amendment purposes."); *Andrews v. State*, 40 P.3d 708, 713 (Wyo. 2002) ("[The defendant's] words and actions demonstrated that he disavowed any ownership or interest in the bag. The framers of the United States and Wyoming constitutions and the citizens who ratified them surely did not intend that a defendant could unequivocally renounce any interest in the property and then later claim a constitutional violation when the officer relies on the defendant's statement and searches the property.").

As the cases cited above demonstrate, a person who verbally disclaims to law enforcement officials any interest in an item being searched cannot later claim standing to challenge the legality of the search. Thus, the officers' knowledge that Porter carried the backpack into the house at an earlier point in time is not relevant to the legal issue as presented in *Brown*, which is whether he maintained an interest in the backpack at the time of the search.

In sum, the peace officers' conduct in this case was not clearly and palpably in violation of the state constitution. They applied for a search warrant through the procedures set forth in the Code. A neutral and detached magistrate issued the search warrant based on probable cause to believe that there was evidence of criminal wrongdoing at the premises specified in the warrant, 3601 Woodland Avenue. The officers executed the search warrant at that location according to the instructions in the warrant and the Code. The backpack was not attached to or in the physical possession of a person at the time it was searched and thus was encompassed within the scope of the warrant. The conclusion that the backpack was within the scope of the warrant was reinforced by Porter's own denial that he had knowledge of, ownership of, or any possessory interest in the backpack. This was model law enforcement conduct in accord with the state constitution and the Code.

IV.

For the reasons expressed above, we affirm the district court's denial of Porter's motion to suppress.

**Affirmed.**

Christensen, C.J., and Waterman, Mansfield, and May, JJ., join this opinion. McDermott, J., files a dissenting opinion, in which Oxley, J., joins.

**McDermott, Justice (dissenting).**

As officers waited outside George Civitate's house to move on the execution of a search warrant, a man pulled up in a car and parked along the street outside the house. They watched the man—later identified as Andrew Porter—exit his car, put on a blue backpack, take his dog by its leash, walk to Civitate's door, and enter. The officers' search warrant didn't mention Porter. Indeed, they didn't know Porter, and they had no idea that Porter would happen to visit Civitate at almost the exact moment of their planned entry to execute the warrant.

Once inside the house, officers searched Porter's backpack. They did so despite knowing that the backpack belonged not to Civitate but to Porter; they saw Porter remove it from his car, put it on, and bring it into the house; they saw it resting next to the couch where Porter sat, under the jacket they'd seen him wearing; they repeatedly asked Porter about its contents. We're here on this appeal because Porter was ultimately convicted of possessing drugs the officers found in the backpack because it was, indeed, his backpack.

Porter asserts a constitutional violation in the officers' search of his backpack. We return to constitutional first principles: before a state official may search or seize "persons, houses, papers and effects," the official must first obtain a warrant, which must be based on probable cause, supported by an oath or affirmation, and specifically describe the place to be searched and the items or persons to be seized. Iowa Const. art. I, § 8. Mere visitors to a place—and personal effects known to belong to them—do not fall within the scope of a warrant to search that place unless the visitor or their effects are specifically mentioned in the warrant. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *State v. Brown*, 905 N.W.2d 846, 847 (Iowa 2018). That's because probable cause is

always absent if there's no knowledge at the time a warrant is issued of any connection between the visitor and the place to be searched. *See State v. Jamison*, 482 N.W.2d 409, 413 (Iowa 1992) (en banc), *overruled in part on other grounds by*, *State v. Heminover*, 619 N.W.2d 353 (Iowa 2000) (en banc). After all, how can probable cause exist to search a third party or their effects if their presence at the scene was never contemplated by the officer who sought the warrant or the judge who signed it?

Today, the court holds that Porter's backpack fell within the coverage of the search warrant as written despite nothing in the warrant authorizing a search or seizure of Porter or his belongings. In so doing, the majority boldly goes where no one in this case has gone before, or has even asked to go. Neither the State in its arguments below or on appeal, nor the district court in its ruling on Porter's motion to suppress, hint at any assertion that the search of Porter's backpack was permitted under the warrant itself. The State's arguments and the district court's holding instead focus on an abandonment theory, and in particular that Porter's answers to officers' questions at the scene indicated an intent to relinquish or disclaim his ownership of the backpack. In an alternative argument, the State doubles down on its rejection of the notion that the warrant itself authorized the backpack's search, asserting instead—to quote its own brief—that "officers had valid bases for the search that were *separate and distinct from* the search warrant." (Emphasis added.) The majority hardly discusses the fighting issue raised by the parties in this case—abandonment—on its way to deciding the case on a ground no one presented.

Reliance on the warrant to justify the search here is, in my view, unavailing. The only person mentioned as a target of the search in the warrant is Civitate himself. The warrant describes Civitate at length, both as to physical

characteristics and personally identifiable information (including his date of birth, social security number, and driver's license number). The warrant authorizes a search of Civitate's residence; no one else's. It describes "vehicles registered to George Civitate" as within the property covered, and gives the make, model, color, and license plate for each of Civitate's three vehicles.

An officer's affidavit used to support the warrant application mentions only Civitate in connection with the drug distribution under investigation, describing information from a confidential informant (CI) "that a male known to the CI as George Civitate is involved in the sale and distribution of methamphetamine in the Des Moines" metro area. The affidavit explains how the officer confirmed Civitate's address using a combination of Civitate's department of transportation records, the county assessor's website, utility billing records, and information from the CI. The application lists only Civitate's criminal history and only Civitate's vehicle registration history. It details several undercover drug buys that the officer facilitated between the CI and only Civitate, all at Civitate's house.

Nothing in the warrant mentions or even alludes to Porter. The officers who entered Civitate's house to execute the warrant knew nothing about the man who'd just arrived beyond what they had observed. They did not know his name, his reason for being there, or his connection to Civitate.

Our precedents make clear that warrants do not extend to the bags of visitors who happen to be present at a house where a warrant is being executed. In *State v. Brown*, police obtained a warrant to search a man named Jeffrey Sickles and the house where he lived. 905 N.W.2d at 847. But when officers executed the warrant, they found several others present as well. *Id.* The officers had no basis to associate these people with the house. *Id.* After officers handcuffed the visitors and brought them to a different room, one of the officers

searched a purse that had been on the floor next to one of the visitors when the officers entered. *Id.* The officer found marijuana in the purse, and the state charged the purse's owner with possession of marijuana. *Id.* The defendant argued that the search of her purse violated her rights under both the State and Federal Constitutions. *Id.* at 847–50. On appeal, we reversed the denial of her motion to suppress evidence from the search, applying the principle derived from our prior cases that "a search of the possessions of a third party at a residence is unconstitutional when the warrant does not support probable cause to search that particular person." *Id.* at 853.

*Brown*'s holding, as we elaborated, built on precedents from prior cases. In an earlier case, *State v. Jamison*, police obtained a search warrant that covered the residence of a man named Terry Rodriguez "and the person and vehicles of any other subjects at the residence after the signing of the search warrant." 482 N.W.2d at 411 (emphasis omitted). Shortly after obtaining the warrant, officers saw a man named Anthony Jamison enter Rodriguez's house and then leave several minutes later. *Id.* Police stopped Jamison's vehicle and searched it, finding cocaine in a paper wrapper on the floorboard. *Id.* In reversing the district court's denial of Jamison's motion to suppress, we noted the lack of evidence establishing any nexus between Jamison or his vehicle "and the existence of criminal activity at the targeted premises." *Id.* at 413. We concluded that "[i]f a warrant calls for the search of multiple places or persons, probable cause must exist as to each location or person sought to be searched under authority of the warrant." *Id.* at 412.

Likewise, in *State v. Fleming*, police obtained a search warrant for the residence of a man named Andrew Nearman. 790 N.W.2d 560, 562 (Iowa 2010). In conducting the search, officers entered a bedroom rented by a man named

Joshua Fleming and found a baggie of marijuana in the closet. *Id.* The search warrant made no mention of Fleming; it named only Nearman. *Id.* When the state charged Fleming with possession of marijuana, he moved to suppress the evidence from the search. *Id.* The district court denied the motion, concluding that the warrant extended to the entire residence, including Fleming's rented room. *Id.* at 563. We reversed, finding that the officers were on notice that Fleming rented the bedroom and had no reason to believe that Nearman had access to it. *Id.* at 567–68. Because the warrant named only Nearman, we held that the state needed to make an independent showing of probable cause to search Fleming's room, but had failed to do so. *Id.* at 568.

Neither *Jamison* nor *Fleming* gets a mention in the majority opinion here. The majority nonetheless claims that its conclusion—"that the scope of the warrant includes any personal effects not in the physical possession of a person not identified in the warrant"—is "supported by Iowa caselaw." But the majority cites no Iowa Supreme Court case on this point. Instead, the majority cites one published and three unpublished court of appeals decisions, none of which are precedential to us. None in fact apply here in any event, as none dealt with evidence seized from a visitor to a property subject to search under a warrant, or someone otherwise unidentified in the warrant. *See State v. Stockman*, No. 20–1360, 2022 WL 109183, at *7 (Iowa Ct. App. Jan. 12, 2022) ("Stockman was no mere visitor or passerby. . . . Stockman's admission that she used methamphetamine with [the target of the warrant] at this residence was included in the application for the search warrant."); *State v. Barbosa-Quinones*, No. 08–1830, 2009 WL 4111127, at *7 (Iowa Ct. App. Nov. 25, 2009) (finding "no evidence that the defendant was a mere visitor, or even that the officers knew the purse belonged to the defendant"); *State v. Fisher*, No. 99–1098, 2000 WL

1724552, at \*1 (Iowa Ct. App. Nov. 20, 2000) (involving no visitor whatsoever but simply a search warrant for the defendant's own residence); *Munz v. State*, 382 N.W.2d 693, 701 (Iowa Ct. App. 1985) (same). Stated simply, none of the court of appeals cases that the majority cites support the majority's holding here.

*Brown* is a different matter. *Brown* is not simply persuasive authority on the question the majority reaches for here; it is binding precedent. The State does not ask us to overrule *Brown* or any other case. And the majority, for its part, does not expressly overrule *Brown* on its own initiative. But it hollows out *Brown*'s holding through revisionist analysis, calling *Brown* "predicated on a fundamental misunderstanding of search warrants" and asserting that the court committed a "category error" by "framing that case as a warrantless-search case" instead of one "involving the scope of a search warrant."

The majority misconstrues *Brown*. We focused extensively in *Brown* on the search warrant's scope. 905 N.W.2d at 851–54. We rejected the state's argument that the defendant in *Brown* was subject to search under that warrant, concluding that the failure to identify a third party in a warrant to search a residence means that "that party continues to have expectations of privacy when a search warrant is executed on a residence in which they are present." *Id.* at 852. And this protection extends to the third party's belongings, even when they do not maintain actual possession of their belongings at all moments. *Id.* at 854–55.

In the majority's telling, we concluded in *Brown* "that the search of Brown's purse was a prohibited search of her *person.*" (Emphasis added.) But this interpretation misses the core of our holding. Our conclusion rested on the fact that the officer conducted a warrantless search of an "effect"—the purse—despite being on notice that it belonged to a visitor who maintained constructive

possession of it. 905 N.W.2d at 856. We held that the defendant's close proximity to her purse under the circumstances ("located right next to the kneeling Brown") was sufficient to establish that the purse belonged to her, and not the man named in the warrant, making its search unlawful. *Id.*

The majority here refers to Porter's backpack as an "unattended effect" despite the State's concession in its brief to the contrary—that "the blue backpack was in an area within Porter's 'immediate control' at the time of his arrest." In greenlighting an officer's search of any visitor's bag not in direct physical contact with its owner, the majority attempts to roll back the odometer on the question settled in *Brown* and pivot to an "approach [that] has been rightly criticized." 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.10(b), at 934 (6th ed. 2020) [hereinafter LaFave]; *see also Hummel-Jones v. Strope*, 25 F.3d 647, 651 (8th Cir. 1994) (rejecting the argument that officers could search visitors' personal bags "merely because those bags are not in the visitors' hands"). As Professor LaFave explains, to safeguard a visitor's independent privacy rights, officers "must take into account their own knowledge about the possession of personal effects found at the scene in determining what the warrant is intended to cover." 2 LaFave § 4.10(b), at 935.

Porter didn't forfeit his privacy rights in the backpack simply because he had placed it next to the couch where he sat. In *Brown*, we criticized the actual-possession test that the majority adopts today as fanciful, stating that the notion "that a visitor loses all reasonable expectations of privacy when visiting a premises by hanging a coat on a rack or placing a purse on a chair or on the floor, simply does not comport with reality." 905 N.W.2d at 854–55 (citing *United States v. Micheli*, 487 F.2d 429, 431 (1st Cir. 1973)). The majority's reversal about what reality will bear perhaps gives life to Bob Dylan's complaint that "[r]eality

has always had too many heads." Bob Dylan, *Cold Irons Bound*, *on Time Out of Mind* (Columbia Recs. 1997). In any event, the majority's embrace of the actual-possession test today is irreconcilable with our ringing rejection of it as a "completely unrealistic" rule that "cannot possibly pass constitutional muster under article I, section 8 of the Iowa Constitution." *Brown*, 905 N.W.2d at 855.

Applying an actual-possession test also creates a legal double standard, making constructive possession sufficient to find someone guilty of possessing contraband, yet making constructive possession insufficient for the person to claim protection from an officer's warrantless search. We identified this problem in *Brown*, too, calling it "unprincipled in the extreme" to apply "an expansive conception of constructive possession for purposes of upholding criminal convictions, but then apply a narrow view of constructive possession for the purpose of defeating search and seizure rights asserted by a suspect." *Id.* at 855–56. Suffice it to say, nothing in the constitution compels this possessory dice-loading in favor of the State that we previously rejected.

Further, the majority points to a statute, Iowa Code § 808.7(2) (2023), that it asserts "legally required" the officers executing the warrant to search the backpack because it might have contained evidence described in the warrant. But § 808.7(2) merely provides that in executing a search warrant, officers may search any person or thing present at the time of the search "[t]o prevent the disposal or concealment of any property subject to seizure described in the warrant." *Id.* This statute does not apply here, both because the State never argues that Porter's backpack was used for "disposal or concealment" of Civitate's drugs (let alone that its search was necessary on that basis), and because Porter's backpack was never "described in the warrant," which targets only Civitate. *Id.*

Turning to the abandonment issue—the issue that the parties actually raised and the district court actually ruled on—I would hold that the State failed to meet its burden. The relevant facts here were all captured on officer bodycam videos. After police entered the house and handcuffed Civitate, Porter, and a woman who had been sleeping upstairs, officers began separately interviewing each of them by turns in a van parked outside. During his interview, Porter stated that he did not live at the house. When asked if he brought anything with him, Porter claimed that he'd brought only his dog. When asked about the blue backpack that he'd carried into the house, Porter responded, "I don't know about that," and claimed that he'd only brought "dog stuff" with him. Shortly after, Porter told the officers that he wanted to speak with an attorney and cut off the interview. Officers then brought him back inside, and he sat handcuffed on the living room couch while officers continued searching the house.

While Porter remained seated on the couch, one of the officers at the scene, Officer Galetich, picked up the blue backpack and (notwithstanding the prior declaration that he wished to speak to a lawyer) asked Porter, "Whose bag is this? Is this your bag?" Porter shook his head side-to-side and made a sound indicating "no." A second officer then asked, "Is that the bag he carried in?" A third officer responded, "Yeah, that's the backpack he carried in." When Porter experienced a spell of heavy breathing, Officer Galetich, still holding the backpack, asked Porter, "Does it have your inhaler in it?" Porter replied, "No." Another officer then asked, "Just drugs?" Porter replied, "I don't know none of that." One of the officers responded, "Be honest." Officer Galetich then searched the jacket that Porter had been wearing outside and that he had placed on top of the backpack, finding a cellphone and the keys to Porter's car in the pocket. Porter acknowledged that the cellphone was his. Shortly after, Officer Galetich

searched the backpack. During the search of the house, Officer Galetich referred to the blue backpack as belonging to Porter at least two different times.

The State argues that Porter's answers to the officers' questions indicated his intent to abandon the backpack, thus totally forfeiting any privacy rights in it. But under Iowa law, whether property has been abandoned hinges on whether a person voluntarily abandons the thing in question. *State v. Bumpus*, 459 N.W.2d 619, 625 (Iowa 1990). "Abandonment is shown by proof that the owner intends to abandon the property and has voluntarily relinquished all right, title and interest in the property." *Benjamin v. Lindner Aviation, Inc.*, 534 N.W.2d 400, 406 (Iowa 1995) (en banc). Determining "whether a person has voluntarily abandoned property" is thus a question of intent, and intent "may be inferred from words, acts, and other objective facts." *Bumpus*, 459 N.W.2d at 625.

In *State v. Bumpus*, we found abandonment where the defendant committed an affirmative physical act of separation; in that case, throwing a pouch over a fence while fleeing police. *Id.* But unlike the defendant in *Bumpus*, there was no physical relinquishment here by Porter. The backpack was next to the couch where he sat and, as the State concedes, "in an area within Porter's 'immediate control' at the time of his arrest." The alleged abandonment was purely verbal. And while some federal courts have accepted verbal disclaimers as abandonment, *see United States v. Ferebee*, 957 F.3d 406, 413–14 (4th Cir. 2020), we should be wary of accepting abandonment-by-speech under circumstances like those here, *see United States v. Lopez-Cruz*, 730 F.3d 803, 808–09 (9th Cir. 2013).

The officers had objective knowledge that the backpack belonged to Porter. As mentioned, the bodycam footage shows an officer asking if the backpack was the one Porter carried in, and another confirming it was, shortly before they

searched the backpack. At the suppression hearing, the lead officer executing the warrant agreed that he "knew it was [Porter's] backpack" and "had every reason to think that's his backpack" after seeing him walk in with it. In our search-and-seizure analysis, we generally look to the objective reasonableness of an officer's conduct. Given that the officers knew that Porter brought the backpack into the house and saw it sitting beside the couch where he sat when they entered, treating the backpack as "abandoned" was objectively unreasonable under the circumstances.

Abandonment also requires a *voluntary* relinquishment of ownership. *Benjamin*, 534 N.W.2d at 406. Porter's answers about the backpack occurred while he was detained, handcuffed, and being interrogated. He had already invoked his right to silence when officers reinitiated questioning about the backpack inside the house. His denial of ownership under the circumstances strikes me as less a waiver of privacy and more a refusal to incriminate himself. If we allow police to bypass the warrant requirement by badgering detained visitors until they deny ownership of a bag the officers know is theirs, we create a perverse incentive for officers to interrogate visitors to manufacture an abandonment excuse, circumventing the rule that visitors' effects are protected.

I'm similarly unpersuaded by the State's fallback argument that even if not abandoned, the backpack would have been searched as part of a search incident to Porter's arrest based on an outstanding arrest warrant. The key elements of timing and proximity work against the State's argument on this point. Under *Chimel v. California*, a search incident to arrest is limited to the "the area into which an arrestee might reach" to prevent accessing weapons or destroying evidence. 395 U.S. 752, 762–63 (1969); *see also United States v.*

*Robinson*, 414 U.S. 218, 235–36 (1973); *State v. Gaskins*, 866 N.W.2d 1, 14 (Iowa 2015).

But Porter's proximity to the backpack at the time of *the search itself* is complicated here by the officers' repeated movement of Porter during the execution of the warrant. Recall that Porter was removed from the house, interrogated in a van, and then brought back to the living room where the backpack was located. Officers can't manufacture authority to search by manipulating the circumstances of the arrest. *See United States v. Chadwick*, 433 U.S. 1, 11–16 (1977), *abrogated on other grounds by*, *California v. Acevedo*, 500 U.S. 565 (1991). By returning Porter to the proximity of the backpack after he had been secured elsewhere, the State relies on a *Chimel* justification of its own creation that did not exist when, shortly before, officers had detained the handcuffed Porter in a van for interrogation. Officers cannot rely on officer-safety or evidence-destruction rationales to defend the search of the backpack here.

Our constitutional search and seizure protections are "not mere second-class rights" but rather "indispensable freedoms." *Brinegar v. United States*, 338 U.S. 160, 180 (1949) (Jackson, J., dissenting). As indispensable freedoms, they do not fade away when visiting someone else's home, even when police separately have probable cause to search that home. In upholding this search today, the majority first recharacterizes *Brown*'s holding and then distinguishes the effigy left in its place. Unfortunately, *Brown*'s key holding protecting the privacy rights of visitors in their possessions under the Iowa Constitution is nowhere to be found in the majority's opinion, despite the parallel facts presented here. Officers carrying out a search warrant must respect the constitutional privacy rights of people not named in a warrant, including their right to privacy in their personal property. Because I would rely on our precedents to find the search of Porter's

backpack unlawful, I would reverse the district court's denial of Porter's motion to suppress. I thus respectfully dissent.

Oxley, J., joins this dissent.